UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NORVELL ANDREW,<br><br>           Plaintiff,<br><br>    v.<br><br>UNITED STATES OF AMERICA, et al.,<br><br>           Defendants. | Case No.: 1:22-cv-01290-KES-CDB<br><br>**FINDINGS AND RECOMMENDATIONS TO DISMISS CERTAIN CLAIMS AND DEFENDANTS FOLLOWING SCREENING OF PLAINTIFF'S SECOND AMENDED COMPLAINT**<br><br>**14-DAY OBJECTION DEADLINE** |

Plaintiff Norvell Andrew is a federal prisoner proceeding pro se and *in forma pauperis* in this civil rights action.

**I.      RELEVANT BACKGROUND**

This Court issued its First Screening Order on July 20, 2023. (Doc. 19.) Plaintiff was directed to do one of the following: (1) file a first amended complaint curing the deficiencies identified in the screening order; or (2) provide written notice that he wished to proceed on the claims found cognizable by the Court; or (3) file a notice of voluntary dismissal. (*Id*. at 15-16.)

Plaintiff filed a first amended complaint on August 14, 2023. (Doc. 21.) On March 22, 2024, a document titled "Amended Complaint/Supplemental Complaint" was lodged with the Court. (Doc. 27.)

On May 6, 2024, the Court issued its Second Screening Order. (Doc. 35.) The Court found Plaintiff's first amended complaint stated cognizable Eighth Amendment failure to protect claims

against Defendants Barnes, Beaudreau, Bennett, Cervantes, Ceja, Ciolli, Dewilde, Heldman, Haslett, Lopez, Lyons, McClure, Schaffer, Scott, Simpson, Vandenover, and Zaragoza, as well as Eighth Amendment deliberate indifference to serious medical needs claims against Defendants Palenteghi and Spheres. (*Id*. at 11-17.) However, the Court also found Plaintiff failed to allege any other cognizable claim against any other named defendant. (*Id*.) Plaintiff was directed to do one of the following within 21 days of the date of service of the order: (1) to notify the Court in writing that she does not wish to file a second amended complaint and was willing to proceed only on the Eighth Amendment claims found cognizable (referenced above), the remaining claims against any defendant to be dismissed; or (2) to file a second amended complaint curing the deficiencies identified by the Court in the screening order; or (3) to file a notice of voluntary dismissal. (*Id*. at 18-19.)

When Plaintiff failed to respond to the Second Screening Order within 21 days, on June 5, 2024, the Court issued an Order to Show Cause (OSC) why the matter should not be dismissed for her failure to obey a court order. (Doc. 37.) And, when Plaintiff failed to respond to the OSC within 14 days as directed, the Court issued Findings and Recommendations to dismiss this action for a failure to obey courts orders and failure to prosecute. (Doc. 38.)

Plaintiff then filed a document titled second amended complaint on July 1, 2024. (Doc. 39.)

On July 8, 2024, the Court issued its "Order Vacating Findings and Recommendations To Dismiss This Action For Plaintiff's Failure To Obey Courts Orders And Failure To Prosecute; Order Striking Plaintiff's Second Amended Complaint Filed July 1, 2024; Order Directing Plaintiff To Re-File Second Amended Complaint Within 21 Days." (Doc. 41.)

Plaintiff then filed a document titled "Motion to Reconsider" on July 23, 2024. (Doc. 43.)

On July 26, 2024, construing Plaintiff's previous filing to be objections to the earlier Findings and Recommendations, the Court directed the Clerk of the Court to provide Plaintiff with a copy of the July 8, 2024, order, and another blank civil rights complaint form. (Doc. 44 at 1-4.) It also extended the deadline for Plaintiff to re-file her second amended complaint within 21 days, cautioning that "should her second amended complaint fail to comply with the Court's

Second Screening Order issued May 6, 2024, and the Court's July 8, 2024, order," a recommendation that this action be dismissed for her failure to obey courts orders and failure to prosecute would result. (*Id*. at 4, emphasis omitted.)

On August 19, 2024, Plaintiff re-filed her second amended complaint. (Doc. 45.)

## II. SCREENING REQUIREMENT

The Court is required to screen complaints brought by prisoners seeking relief against a governmental entity or an officer or employee of a governmental entity. 28 U.S.C. § 1915A(a). The Court must dismiss a complaint or portion thereof if the complaint is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A(b). The Court should dismiss a complaint if it lacks a cognizable legal theory or fails to allege sufficient facts to support a cognizable legal theory. *See Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).

## III. PLEADING REQUIREMENTS

### A. Federal Rule of Civil Procedure 8(a)

"Rule 8(a)'s simplified pleading standard applies to all civil actions, with limited exceptions." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002). A complaint must contain "a short and plain statement of the claims showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "Such a statement must simply give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz*, 534 U.S. at 512 (internal quotation marks & citation omitted).

Detailed factual allegations are not required, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Plaintiff must set forth "sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Id*. (quoting *Twombly*, 550 U.S. at 570). Factual allegations are accepted as true, but legal conclusions are not. *Id*. (citing *Twombly*, 550 U.S. at 555).

The Court construes pleadings of pro se prisoners liberally and affords them the benefit of any doubt. *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010) (citation omitted). However, "the

liberal pleading standard . . . applies only to a plaintiff's factual allegations," not his legal theories. *Neitzke v. Williams*, 490 U.S. 319, 330 n.9 (1989). Furthermore, "a liberal interpretation of a civil rights complaint may not supply essential elements of the claim that were not initially pled," *Bruns v. Nat'l Credit Union Admin.*, 122 F.3d 1251, 1257 (9th Cir. 1997) (internal quotation marks & citation omitted), and courts "are not required to indulge unwarranted inferences." *Doe I v. Wal-Mart Stores, Inc.*, 572 F.3d 677, 681 (9th Cir. 2009) (internal quotation marks & citation omitted). The "sheer possibility that a defendant has acted unlawfully" is not sufficient to state a cognizable claim, and "facts that are merely consistent with a defendant's liability" fall short. *Iqbal*, 556 U.S. at 678 (internal quotation marks & citation omitted).

### B.  42 U.S.C. § 1983 and *Bivens*

Prisoners may bring claims under 42 U.S.C. section 1983 for violations of constitutional or other federal rights by persons acting "under color of state law." Section 1983 "provides a cause of action for the deprivation of any rights, privileges, or immunities secured by the Constitution and laws of the United States." *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 508 (1990) (quoting 42 U.S.C. § 1983). A civil rights action under section 1983 is the proper remedy for a constitutional challenge to the conditions of imprisonment. *See Preiser v. Rodriguez*, 411 U.S. 475, 499 (1973) ("[A] § 1983 action is a proper remedy for a state prisoner who is making a constitutional challenge to the conditions of his prison life, but not to the fact or length of his custody").

An action under *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics* (403 U.S. 388 (1971)) is the federal analog to suits brought against state officials under section 1983. *Iqbal*, 556 U.S. at 676–77 (quoting *Hartman v. Moore*, 547 U.S. 250, 254, n.2 (2006)). *Bivens* actions and section 1983 claims "are identical save for the replacement of a state actor under § 1983 by a federal actor under *Bivens*." *Van Strum v. Lawn*, 940 F.2d 406, 409 (9th Cir. 1991). Pursuant to *Bivens*, under limited circumstances, federal actors can be liable for a violation of an individual's civil rights. *Minneci v. Pollard*, 565 U.S. 118, 122–23 (2012). A plaintiff may sue a federal officer in his or her individual capacity for damages for violating the plaintiff's constitutional rights. *See Bivens*, 403 U.S. at 397. To state a claim a plaintiff must allege: (1) that

a right secured by the Constitution of the United States was violated, and (2) that the alleged violation was committed by a federal actor. *Kandi v. Mgmt. & Training Corp.*, No. 1:16-cv-00794-BAM (PC), 2017 WL 2081117, at *3 (E.D. Cal. May 15, 2017) (citing *inter alia West v. Atkins*, 487 U.S. 42 (1988)).

### C. Linkage and Causation

Section 1983 provides a cause of action for the violation of constitutional or other federal rights by persons acting under color of state law. *See* 42 U.S.C. § 1983. To state a claim under section 1983, a plaintiff must show a causal connection or link between the actions of the defendants and the deprivation alleged to have been suffered by the plaintiff. *See Rizzo v. Goode*, 423 U.S. 362, 373-75 (1976). The Ninth Circuit has held that "[a] person 'subjects' another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legal required to do that causes the deprivation of which complaint is made." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978) (citation omitted).

### D. Supervisory Liability

Liability may not be imposed on supervisory personnel for the actions or omissions of their subordinates under the theory of respondeat superior. *Iqbal*, 556 U.S. at 676-77; *see e.g., Simmons v. Navajo Cty., Ariz.*, 609 F.3d 1011, 1020-21 (9th Cir. 2010) (plaintiff required to adduce evidence the named supervisory defendants "themselves acted or failed to act unconstitutionally, not merely that subordinate did"), *overruled on other grounds by Castro v. Cnty. of Los Angeles,* 833 F.3d 1060, 1070 (9th Cir. 2016); *Jones v. Williams,* 297 F.3d 930, 934 (9th Cir. 2002) ("In order for a person acting under color of state law to be liable under section 1983 there must be a showing of personal participation in the alleged rights deprivation: there is no respondeat superior liability under section 1983").

Supervisors may be held liable only if they "participated in or directed the violations, or knew of the violations and failed to act to prevent them." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). "The requisite causal connection may be established when an official sets in motion a

5

'series of acts by others which the actor knows or reasonably should know would cause others to inflict' constitutional harms." *Corales v. Bennett*, 567 F.3d 554, 570 (9th Cir. 2009). Accord *Starr v. Baca*, 652 F.3d 1202, 1205-06 (9th Cir. 2011) (supervisory liability may be based on inaction in the training and supervision of subordinates).

Supervisory liability may also exist without any personal participation if the official implemented "a policy so deficient that the policy itself is a repudiation of the constitutional rights and is the moving force of the constitutional violation." *Redman v. Cty. of San Diego*, 942 F.2d 1435, 1446 (9th Cir. 1991) (citations & quotations marks omitted), *abrogated on other grounds by Farmer v. Brennan*, 511 U.S. 825 (1970).

To prove liability for an action or policy, the plaintiff "must ... demonstrate that his deprivation resulted from an official policy or custom established by a ... policymaker possessed with final authority to establish that policy." *Waggy v. Spokane County Washington*, 594 F.3d 707, 713 (9th Cir. 2010). When a defendant holds a supervisory position, the causal link between such defendant and the claimed constitutional violation must be specifically alleged. *See Fayle v. Stapley*, 607 F.2d 858, 862 (9th Cir. 1979). Vague and conclusory allegations concerning the involvement of supervisory personnel in civil rights violations are not sufficient. *See Ivey v. Bd. of Regents*, 673 F.2d 266, 268 (9th Cir. 1982).

**IV.     DISCUSSION**

    **A. Plaintiff's Second Amended Complaint**

Plaintiff names the United States of America and the following individuals, employed at the United States Penitentiary in Atwater, California, as defendants in this action:

    Andrew Ciolli
    Kimberly Bennett
    Unit Manager Schafer
    Lieutenant Zaragoza
    Lieutenant Heldman
    Lieutenant Dewilde
    Lieutenant Lemur
    Technician Vandenover
    Counselor Lyons
    Counselor Haslett
    Counselor Beaudreau

          Captain Scott
          Officer Simpson
          Officer Ceja
          Officer Lopez
          Officer Barnes
          Officer McClure
          Case Manager Bollinger
          Doctor Palentghi
          Nurse Spheres
          Nurse Young
          Nurse Placencia

(Doc. 45 at 1-6.) Plaintiff seeks to have her "left eye" and "left hand" "fixed, to be transferred to "FCC Yazoo," "$5,007,000 in damages," and "15 days a month in First Step Act time" for every months she has been "in SHU & unable to program …" (*Id*. at 20.)

### B. Plaintiff's Factual Allegations

<u>Claim One</u>

Plaintiff states on about February 20, 2020, she arrived at USP Atwater and was assigned to a cell with an active gang member. (Doc. 45 at 3.) Plaintiff was told she could not live with the gang member due to her sexuality. (*Id*.) Defendant Barnes then placed Plaintiff in a single cell. (*Id*.) Plaintiff states she was housed alone for about two weeks until March 5, 2020, when Defendant Lyons approached her assigned cell and told her to pack her belongings because she was moving to another cell with Inmate Brooks.[1] (*Id*. at 3, 19.) Plaintiff asserts she advised Lyons that her life would be in danger if she was housed with Brooks and that she did not wish to die in prison. (*Id*. at 19.) Lyons advised her she could go into the cell with Brooks, or she would go to the security housing unit (SHU). (*Id*.) Plaintiff chose the SHU "over being stabbed." (*Id*.) Lyons had Plaintiff moved to the SHU and wrote an incident report indicating she refused to program. (*Id*.) Plaintiff states she was released from the SHU "about March 12, 2020," and Lyons was going to house her with Brooks. (*Id*.) However, Plaintiff alleges that Brooks and another inmate were already assigned to that cell. (*Id*.) She was subsequently moved to Unit 6B. (*Id*.)

On or about March 11, 2020, Defendant Haslett informed Plaintiff she had to have a

---

[1] Various pages associated with Claims 1 and 2 are out of numerical order; therefore, page reference citations will also appear out of order.

cellmate, then moved Plaintiff to Unit 6A with inmate James Ladson. (*Id*. at 7.) Ladson advised Plaintiff that his Jewish faith would not allow him to be housed with a homosexual. (*Id*.) Ladson and Plaintiff approached correctional officers and advised them of the situation and asked to be moved. (*Id*.) They were told to speak with the lieutenant. (*Id*.) Defendant Lemur told Plaintiff to tell the correctional officer to place her in a single cell if one was available. (*Id*.) If a cell was not available, Lemur told Plaintiff that she and Ladson "had to tough it out until" the following day because he could not move her "from unit to unit." (*Id*.) Lemur also advised Plaintiff that if a cell was available, but officers refused to move her, to "tell the officer to call Lemur." (*Id*.) Plaintiff and Ladson approached Defendant Haslett on their return to the housing unit. (*Id*.) After listening to their explanation, Haslett stated that because neither Plaintiff nor Ladson were "in his unit," he was going home. (*Id*.) Plaintiff contends "both unknown officers," Lemur and Haslett were "negligent to" her safety, failed to protect her, and she "suffered several serious injuries" as a result. (*Id*. at 7-8.)

On or about March 17, 2020, Plaintiff spoke with Defendant Bollinger and advised Bollinger that her life was in danger and that she needed to be housed with another inmate "who is alright with plaintiff's sexual preferences." (Doc. 45 at 8.) When Bollinger advised Plaintiff that he was not responsible for cell moves, she pleaded with him to move her. (*Id*.) He stated he would call Defendant Schafer and see if he (Bollinger) could move Plaintiff. (*Id*.) Schafer advised Bollinger not to move Plaintiff and that Plaintiff was trying to manipulate the system. (*Id*.) Plaintiff asked Bollinger to review an incident report of April 20, 2016, in which she was caught having sex with her cellmate Alfredo Cuellar, and advised Bollinger she was not seeking a single cell but was offering to move in with another transgendered inmate, James Mitchell. (*Id*.) When Bollinger advised Schafer of Plaintiff's statements, Schafer told Plaintiff she was not moving, and that Mitchell was not going to receive a cellmate. (*Id*.) Later, Plaintiff spoke with Defendants Vandenover and Zaragoza about the situation. (*Id*.) They advised her they were not responsible for cell moves and that she should speak with her unit team. (*Id*.) Plaintiff spoke with Schafer again and asked to be moved. (*Id*.) Schafer refused the request. (*Id*. at 8-9.) Plaintiff then spoke with Defendant Scott, who advised Plaintiff cell moves were "up to" the unit team. (*Id*. at 9.)

8

1    Plaintiff asserts she then spoke with Defendant Bennett and explained the situation. (*Id*.) Bennett
2    advised Plaintiff to return "when something happens" and that Plaintiff "should get a knife." (*Id*.)
3         On or about March 18, 2020, Plaintiff spoke with Defendant Beaudreau and explained the
4    situation. (Doc. 45 at 9.) Beaudreau advised Plaintiff neither she nor Ladson could be moved
5    pursuant to Schafer's order. (*Id*.) Plaintiff informed Beaudreau that Ladson had pulled a knife on
6    her and gave her 22 hours to leave their cell. (*Id*.) She explained she had followed the chain of
7    command and repeatedly spoke to her unit team about the situation and was not trying to
8    manipulate the system. (*Id*.) When Beaudreau called Schafer about Plaintiff's explanation,
9    Schafer refused to move Plaintiff again. (*Id*. at 9-10.) Plaintiff states she later spoke with
10   Defendant Ciolli, explaining she had followed the chain of command, giving Ciolli "all the
11   information [she] had explained at each level." (*Id*. at 10.) While speaking with Ciolli, Schafer
12   "came over & listened." (*Id*.) Schafer whispered in Ciolli's ear following Plaintiff's explanation
13   and then Ciolli told Plaintiff to come and see him the following day. (*Id*.) Plaintiff asserts she told
14   Ciolli that she might be dead by then. (*Id*.)
15        On or about March 19, 2020, Plaintiff went to medical. (Doc. 45 at 10.) When she
16   returned to her cell, Ladson entered and stabbed her in the face and began to beat her with a lock.
17   (*Id*.) She contends the United States of America, Schafer, Lyons, Vandenover, Zaragoza, Haslett,
18   Beaudreau, Ciolli, Bollinger, Bennett, Scott, and Lemur were negligent for failing to protect her
19   from being assaulted. (*Id*. at 10-11.)
20        On or about March 21, 2020, Defendants Ceja and Lopez approached Plaintiff's cell with
21   inmate Jefrontys Clyburn and ordered Plaintiff to submit to restraints. (Doc. 45 at 11.) Clyburn
22   immediately told Ceja and Lopez that he could not live with Plaintiff because he is an active gang
23   member, and his gang brothers would kill him for living with "a faggot." (*Id*.) When Plaintiff
24   refused to submit to the restraints, Ceja and Lopez left with Clyburn. (*Id*.) Shortly thereafter,
25   Defendant Simpson arrived and ordered Plaintiff to submit to restraints "for a cellmate." (*Id.*)
26   Plaintiff refused and told Simpson she had just been stabbed and beaten two days before. (*Id*.)
27   Plaintiff advised him she could not defend herself and if Clyburn were housed with her then she
28   would be forced to do so. (*Id*.) Simpson advised Plaintiff that she and Clyburn were "compatible

on paper'' and that was all that mattered. (*Id.*) Plaintiff continued to refuse and asked to speak with the lieutenant. (*Id.*) An hour later, Defendant Cervantes[2] approached Plaintiff's cell, screaming "cuff-up." (*Id.* at 11-12.) She attempted to speak with Cervantes, but he screamed again. (*Id.* at 12.) Cervantes told Plaintiff that "there are no women housed at USP Atwater" and repeated that she and Clyburn were compatible on paper. (*Id.*) Cervantes advised Plaintiff that if she did not submit to restraints, she would be sprayed with mace, placed in restraints, and then housed with Clyburn. (*Id.*) Plaintiff submitted. (*Id.*) When Clyburn was placed in the cell, he was uncuffed first. (*Id.*) He turned and began punching Plaintiff; she fell and he kicked her. (*Id.*) Cervantes sprayed mace on Clyburn to no effect and Clyburn continued his assault "until he was tired." (*Id.*) Clyburn told Cervantes that the next time Cervantes placed him in a cell with someone he did not wish to live with, Clyburn would kill that individual. (*Id.*) Clyburn then submitted to restraints. (*Id.*) Plaintiff contends Defendants Ceja, Lopez, Simpson, and Cervantes were negligent and failed to protect her. (*Id.* at 12-13.)

On or about April 21, 2020, while being escorted to the shower, Plaintiff's cellmate Ira Taylor began conversing with one of "his gang brothers name[d] Tim." (Doc. 45 at 13.) When Tim learned Taylor was housed with "the gay dude," he advised Taylor that he needed to move out of the cell he shared with Plaintiff. (*Id.*) Plaintiff asserts Defendants Barnes and McClure overheard the exchange. (*Id.*) When Barnes and McClure advised the inmates in the area to submit to restraints, Taylor refused while Plaintiff complied. (*Id.*) Taylor advised Barnes and McClure that he was "Black Guerrilla family and had been given an order[] to move out of the cell" with Plaintiff. (*Id.*) Despite a direct order from Barnes and McClure, Taylor refused to be restrained and told them he "was not going to get stabbed to live with a faggot that he (Taylor) was not having sex with." (*Id.*) Taylor advised them that if he was returned to the shared cell, he would assault Plaintiff. (*Id.* at 13-14.) Plaintiff was returned to her cell and Taylor remained in the shower area for about an hour. (*Id.* at 14.)

Defendants Heldman and Dewilde arrived with the "take down team." (*Id.*) They spoke

---

[2] Cervantes is not named as a defendant in the second amended complaint. Cervantes's name appears only in the factual allegations concerning Plaintiff's first claim for relief.

1   with Taylor. (*Id*.) Taylor was restrained and returned to the shared cell by Heldman, Dewilde and
2   Officer Gibson.[3] (*Id*.) Plaintiff refused to submit to restraints and told Heldman and Dewilde her
3   life was in danger. (*Id*.) Dewilde started his camera and Plaintiff explained she was not refusing a
4   cellmate but wished to be safe. (*Id*.) Heldman gave Plaintiff "several orders to submit to
5   restraints" but Plaintiff refused. (*Id*.) She begged them not to force Taylor into the cell because
6   her life was in danger. (*Id*.) Heldman gave Plaintiff one final order, stating she would be sprayed
7   with mace. (*Id*.) Plaintiff submitted. (*Id*.) Taylor was placed in the cell, his handcuffs were
8   removed, and he immediately turned and began punching and kicking Plaintiff. (*Id*.) Helman
9   sprayed Taylor with mace and opened the cell door. (*Id*. at 14-15.) Several officers physically
10  removed Taylor from Plaintiff. (*Id*. at 15.) Plaintiff was placed in the shower then "pulled out to
11  see medical staff." (*Id*.) Plaintiff asserts Defendant Placencia "did nothing at all because he
12  (Placencia) was about to go home." (*Id*.) Plaintiff states Heldman apologized to her in the shower
13  area, telling Plaintiff that he thought she was "playing games." (*Id*.) Later that night, Vandenover
14  stated to Plaintiff that she had been assaulted three times in less than a month. (*Id*.) When Plaintiff
15  agreed, he asked her if the assaults were because she "is gay," and Plaintiff replied affirmatively.
16  (*Id*.) When Vandenover asked Plaintiff if she would like to "go to the RHU program," she stated
17  she would. (*Id*.) Vandenover advised Plaintiff she would have to "sign on for protective custody"
18  and provided Plaintiff with a form. (*Id*.) She completed the form and "was then left in SHU for a
19  total of 8 months and shipped to U.S.P. Big Sandy." (*Id*.) Before she left USP Atwater,
20  Vandenover advised Plaintiff she did not qualify for the RHU program. (*Id*.) Plaintiff asked to be
21  returned to general population, but Vandenover denied her request. (*Id*.) Plaintiff advised
22  Vandenover that she "signed on [to] protective custody because she was tricked to do so by
23  Vandenover himself." (*Id*. at 15-16.) Plaintiff states she told Vandenover she had repeatedly
24  spoken with him and Zaragoza before "any of the assaults took place requesting a transgender
25  cellmate," and both told Plaintiff that she would remain housed alone until another transgender
26  person arrived. (*Id*. at 16.)

---

[3] Gibson is not named as a defendant in Plaintiff's second amended complaint.

11

Claim Two

On March 19, 2020, Plaintiff was assaulted and taken to medical. (Doc. 45 at 19.) She saw Defendants Palentghi and Young. (*Id.*) Plaintiff contends when Palentghi saw her the doctor "began cracking jokes." (*Id.*) Palentghi stitched Plaintiff's eye and began swabbing the stab wound on her face with Q-tips and peroxide. (*Id.*) Each time the Q-tip came away it was a vibrant blue color. (*Id.*) Plaintiff states Palentghi told her she "must be a Crip because she bleeds blue." (*Id.*) Palentghi continued to swab the area and the Q-tips continued to come away blue. (*Id.*) Finally, Palentghi told Plaintiff that he had "gotten most of it" and sent her to the SHU. (*Id*. at 19, 16.) When Plaintiff removed the bandage and looked in the mirror, she saw "something hard & blue sticking out of her face." (*Id*. at 16.) She began poking, prodding, and squeezing and a "blue substance which was colored pencil lead" came out of her face. (*Id*.) Defendant Simpson responded to Plaintiff's call for assistance. (*Id*.) Plaintiff showed Simpson the "lead that was protruding from her face" and he returned shortly with restraints and escorted Plaintiff back to medical. (*Id*.) Plaintiff was again seen by Palentghi and Young. (*Id*.) Palentghi swabbed and squeezed the wound and more lead was removed. (*Id*.) The Q-tip constantly came away blue. (*Id*.) After about an hour, Palentghi "tired of swabbing" and told her she "should be good because most colored pencils are non-toxic." (*Id*. at 16-17.) Plaintiff asserts that by then her left hand, face and left eye were extremely painful. (*Id*. at 17.) She requested pain medication and told Palentghi that her hand was broken. (*Id*.) Palentghi ordered an x-ray for her hand and 800 milligram Ibuprofen. (*Id*.) Plaintiff contends Palentghi "completely ignored [her] eye" and sent her to the SHU. (*Id*.)

On or about March 21, 2020, Plaintiff was assaulted by Clyburn and taken to medical. (Doc. 45 at 17.) She was seen by Nurse Spheres and Palentghi. (*Id*.) Stitches were "reapplied" to her left eye because the wound was "reaggravated" by the assault. (*Id*.) Plaintiff states she complained to Spheres that her left eye was "jumping & twitching & was off center." (*Id*.) Spheres told Plaintiff she probably had an orbital fracture and that it would be expensive to fix. (*Id*.) Plaintiff was advised her hand was broken and given an Ace bandage to wrap the hand. (*Id*.) Plaintiff states her face was examined and she was placed on Tylenol 3 for pain and sent back to her cell. (*Id*.)

12

On April 21, 2020, Plaintiff was assaulted by Taylor and taken to medical. (Doc. 45 at 17.) She was seen by Placencia "who did nothing because he was going to go home." (*Id.*)

Plaintiff contends she was "denied medical treatments in all 3 incidents for over 4 years." (Doc. 45 at 17-18.) She asserts her eye is "off center & continues to jump & twitch & cause her to have headaches if she attempts to make eye contact." (*Id.* at 18.) She maintains her hand is "deformed & often cramp[s]." (*Id.*) Plaintiff states Spheres, Palentghi, Young and Placencia were deliberately indifferent to her medical needs. (*Id.*)

### C. Plaintiff's Claims

Plaintiff titles her first claim "Negligence, Failure to Protect, Right to Medical, Cruel & Unusual Punishment" (Doc. 45 at 3) and her second claim as "Cruel & Unusual Punishment, Right to Medical Care, Deliberate Indifference" (*id.* at 19). The Court construes the second amended complaint to assert the following claims: Eighth Amendment failure to protect (Claim One) and Eighth Amendment deliberate indifference to serious medical needs (Claim Two).

<u>Eighth Amendment: Failure to Protect</u>

Prison officials have a duty "to take reasonable measures to guarantee the safety of inmates, which has been interpreted to include a duty to protect prisoners." *Labatad v. Corrections Corp. of America,* 714 F.3d 1155, 1160 (9th Cir. 2013) (citing *Farmer*, 511 U.S. at 832-33 & *Hearns v. Terhune*, 413 F.3d 1036, 1040 (9th Cir. 2005)). To establish a violation of this duty, a prisoner must "show that the officials acted with deliberate indifference to threat of serious harm or injury to an inmate." *Labatad*, 714 F.3d at 1160 (citing *Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1187 (9th Cir. 2002)).

A failure to protect claim under the Eighth Amendment requires a showing that "the official [knew] of and disregard[ed] an excessive risk to inmate ... safety." *Farmer*, 511 U.S. at 837. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, ... and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 842 (citations omitted). The duty to protect a prisoner from serious harm requires that prison officials take reasonable measures to guarantee

the safety and well-being of the prisoner. *Id*. at 832-33; *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998). As "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment," plaintiff must allege facts showing the defendant acted with a "sufficiently culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 297 (1991) (internal quotations marks, emphasis & citations omitted).

To state a claim, the Eighth Amendment requires allegations sufficient to plausibly show that prison officials were deliberately indifferent to a substantial risk of harm or safety. *Farmer*, 511 U.S. at 847. The objective component of an Eighth Amendment requires that a prisoner show he was deprived of something "sufficiently serious." *Foster v. Runnels*, 554 F.3d 807, 812 (9th Cir. 2009) (quoting *Farmer*, 511 U.S. at 834). The state of mind requirement under the subjective component of the Eighth Amendment standard has been defined as "deliberate indifference" to an inmate's health or safety. *Farmer*, 511 U.S. at 834. Under the "deliberate indifference" standard, a prison official cannot be found liable for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety. *Id*. at 837.

Liberally construing the second amended complaint, Plaintiff plausibly alleges Eighth Amendment failure to protect claims against Defendants Barnes, Beaudreau, Bennett, Bollinger, Ceja, Ciolli, Dewilde, Haslett, Heldman, Lemur, Lopez, Lyons, McClure, Schaffer, Scott, Simpson, Vandenover, and Zaragoza. Those individuals had knowledge of a substantial risk of harm or safety to Plaintiff and disregarded the risk presented by individuals housed with Plaintiff on various occasions, resulting in harm to Plaintiff. *See, e.g.*, *Williams v. Bryant*, No. 2:22-cv-01293-JDP (PC), 2023 WL 3937863, at *1 (E.D. Cal. Mar. 6, 2023) (finding transgendered plaintiff plausibly alleged failure to protect claims against defendant to whom she expressed safety concerns and offered details concerning who would attack her, but where her concerns were ignored and she was attacked three days later); *Garraway v. Ciufo*, No. 1:17-cv-00533-ADA-GSA (PC), 2023 WL 1446823, at *2-4 (E.D. Cal. Feb. 1, 2023) (denying defendants' motion for reconsideration concerning denial of a motion for judgment on the pleadings concerning federal prisoner's Eighth Amendment failure to protect claim in *Bivens* context).

//

1    Because Plaintiff did not name Cervantes as a defendant in this action, she has failed to state a cognizable Eighth Amendment failure to protect claim against Cervantes. Further, Plaintiff fails to allege an Eighth Amendment failure to protect claim against any other defendant.

<u>Eighth Amendment: Deliberate Indifference to Serious Medical Needs</u>

Prison officials violate the Eighth Amendment if they are "deliberate[ly] indifferen[t] to [a prisoner's] serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "A medical need is serious if failure to treat it will result in '"significant injury or the unnecessary and wanton infliction of pain."'" *Peralta v. Dillard*, 744 F.3d 1076, 1081-82 (9th Cir. 2014) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds by *WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc)).

To maintain an Eighth Amendment claim based on medical care in prison, a plaintiff must first "show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. Second, the plaintiff must show the defendants' response to the need was deliberately indifferent." *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012) (quoting *Jett*, 439 F.3d at 1096 (quotation marks omitted)).

As to the first prong, indications of a serious medical need "include the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (citation & internal quotation marks omitted); accord *Wilhelm*, 680 F.3d at 1122; *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) ("Examples of serious medical needs include '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain").

As to the second prong, deliberate indifference is "a state of mind more blameworthy than negligence" and "requires 'more than ordinary lack of due care for the prisoner's interests or

1  safety.'" *Farmer*, 511 U.S. at 835 (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)).

2  Deliberate indifference is shown where a prison official "knows that inmates face a substantial

3  risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."

4  *Id*. at 847. In medical cases, this requires showing: (a) a purposeful act or failure to respond to a

5  prisoner's pain or possible medical need and (b) harm caused by the indifference. *Wilhelm*, 680

6  F.3d at 1122 (quoting *Jett*, 439 F.3d at 1096). "A prisoner need not show his harm was

7  substantial; however, such would provide additional support for the inmate's claim that the

8  defendant was deliberately indifferent to his needs." *Jett*, 439 F.3d at 1096 (citing *McGuckin*, 974

9  F.2d at 1060).

10  Deliberate indifference is a high legal standard. *Toguchi v. Chung*, 391 F.3d 1051, 1060

11  (9th Cir. 2004). "Under this standard, the prison official must not only 'be aware of the facts from

12  which the inference could be drawn that a substantial risk of serious harm exists,' but that person

13  'must also draw the inference.'" *Id*. at 1057 (quoting *Farmer*, 511 U.S. at 837). "'If a prison

14  official should have been aware of the risk, but was not, then the official has not violated the

15  Eighth Amendment, no matter how severe the risk.'" *Id*. (quoting *Gibson*, 290 F.3d at 1188).

16  To prevail on a deliberate-indifference claim, a plaintiff must also show that harm resulted

17  from a defendant's wrongful conduct. *Wilhelm*, 680 F.3d at 1122; *see also Jett*, 439 F.3d at 1096;

18  *Hallett v. Morgan*, 296 F.3d 732, 746 (9th Cir. 2002) (prisoner alleging deliberate indifference

19  based on delay in treatment must show delay led to further injury).

20  Liberally construing the second amended complaint, Plaintiff plausibly alleges Eighth

21  Amendment deliberate indifference to serious medical needs claims against Defendants Palentghi,

22  Placencia and Spheres. Plaintiff fails to allege a claim against Defendant Young as she merely

23  asserts that she was seen by Young on March 19, 2020. No facts indicate Young took any action

24  or inaction amounting to deliberate indifference to Plaintiff's serious medical needs.

25  <u>The United States of America</u>

26  As noted above, Plaintiff names the United States of America as a defendant in this action.

27  (Doc. 45 at 12.) Plaintiff was previously advised that the "United States cannot be sued as a

28  Defendant in Plaintiff's *Bivens* claim for damages based on violations of [her] constitutional

1   rights" and that the "United States … is immune from liability." (*See* Doc. 19 at 8 [First
2   Screening Order].) The Court will recommend the United States of America be dismissed from
3   this action.

## Futility of Amendment

5   Plaintiff has been afforded numerous opportunities to correct the deficiencies in her
6   pleadings. *See Cato v. United States*, 70 F.3d 1103, 1106 (9th Cir. 1995). Accordingly, the Court
7   finds granting Plaintiff further leave to amend would be futile. *Hartman v. CDCR*, 707 F.3d 1114,
8   1129-30 (9th Cir. 2013).

## Summary of Screening Analysis

10   In sum, liberally construed, Plaintiff's second amended complaint asserts the following
11   cognizable claims: (1) Eighth Amendment failure to protect claims against Defendants Barnes,
12   Beaudreau, Bennett, Bollinger, Ceja, Ciolli, Dewilde, Haslett, Heldman, Lemur, Lopez, Lyons,
13   McClure, Schafer, Scott, Simpson, Vandenover, and Zaragoza; and (2) Eighth Amendment
14   deliberate indifference to serious medical needs claims against Defendants Palentghi, Placencia,
15   and Spheres. Plaintiff fails to allege any other cognizable claim against any other named
16   defendant. Therefore, the Court will recommend this action proceed on the claims noted above.
17   Further, it will recommend that Defendant United States of America and Defendant Young be
18   dismissed from this action.

19   **V.   ORDERS AND RECOMMENDATIONS**

20   For the reasons stated above, the Clerk of the Court is **DIRECTED** to:

21   1.  Terminate "Lazarith, Unit Manager," "Cervantes, Lt.," and "Carillo, Case Manager"
22       on the docket for this action as these individuals are not named as defendants in
23       Plaintiff's second amended complaint;
24   2.  Add "Lieutenant Dewilde," "Lieutenant Lemur," "Doctor Palentghi," "Nurse
25       Placencia," and "Nurse Spheres," as defendants on the docket for this action; and
26   3.  Correct "Barnette" to "Bennett," and "McCullum" to "McClure."

27   Further, the Court **RECOMMENDS** that:

28   1.  This action **PROCEED** *only* as to the following claims asserted in Plaintiff's second

amended complaint: (1) Eighth Amendment failure to protect claims against Defendants Barnes, Beaudreau, Bennett, Bollinger, Ceja, Ciolli, Dewilde, Haslett, Heldman, Lemur, Lopez, Lyons, McClure, Schafer, Scott, Simpson, Vandenover, and Zaragoza; and (2) Eighth Amendment deliberate indifference to serious medical needs claims against Defendants Palentghi, Placencia, and Spheres;

2. Any remaining claims be **DISMISSED**;

3. Defendant United States of America be **DISMISSED**; and

4. Defendant Young be **DISMISSED**.

These Findings and Recommendations will be submitted to the district judge assigned to this case, pursuant to 28 U.S.C. § 636(b)(l). **Within 14 days** of the date of service of these Findings and Recommendations, a party may file written objections with the Court. The document should be captioned, "Objections to Magistrate Judge's Findings and Recommendations." Failure to file objections within the specified time may result in waiver of rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:  **September 27, 2024**

UNITED STATES MAGISTRATE JUDGE

18